IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AICHA HAMADOU, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO. 20-2755 |
| KILOLO KIJAKAZI,[1] | : | |
| Acting Commissioner of Social Security, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

Aicha Hamadou ("Hamadou" or "Plaintiff") seeks review, pursuant to 42 U.S.C.

§ 405(g), of the Commissioner of Social Security's ("Commissioner") decision ceasing her

Supplemental Security Income ("SSI") disability benefits pursuant to Title XVI of the Social

Security Act.[2]  For the reasons discussed below, Hamadou's Request for Review will be denied.

I.     **FACTUAL AND PROCEDURAL BACKGROUND**

Hamadou was born on August 10, 2000.  R. at 22.[3]  On March 4, 2020, the Social

Security Administration approved Hamadou's claim for SSI as of October 1, 2009.  Id. at 15.

---

[1]     Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021.
Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Ms. Kijakazi should be
substituted for the former Commissioner of Social Security, Andrew Saul, as the
Defendant in this action.  No further action need be taken to continue this suit pursuant to
section 205(g) of the Social Security Act.  42 U.S.C. § 405(g).

[2]     In accordance with 28 U.S.C. § 636(c), the parties voluntarily consented to have the
undersigned United States Magistrate Judge conduct proceedings in this case, including
the entry of final judgment.  See Doc. Nos. 3, 6.

[3]     Citations to the administrative record will be indicated by "R." followed by the page
number.

Hamadou was found to meet the listing for intellectual disorder.  Id. at 20.  On June 1, 2017, at

age 16, Hamadou was found to be no longer disabled as of June 1, 2017.  Id. at 15.  This

determination was upheld upon reconsideration after a disability hearing by a State Agency

Disability Hearing Officer.  Id.  A timely written request for a hearing before an Administrative

Law Judge ("ALJ") was filed on Hamadou's behalf.  Id.  On August 9, 2018, Hamadou turned

18 years old.  Id.  A hearing before an ALJ was held on November 20, 2018, during which

Hamadou was represented by counsel.  Id.  On April 4, 2019, the ALJ issued an opinion finding

that Hamadou's disability ended as of June 1, 2017, and that Hamadou did not become disabled

as a child again after that date.  Id.  Moreover, the ALJ concluded that, as an adult, Hamadou

likewise was not disabled.  Hamadou filed an appeal with the Appeals Council, which was

denied on April 6, 2020, thereby affirming the decision of the ALJ as the final decision of the

Commissioner.  Id. at 1-6, 204-07.  Hamadou then commenced this action in federal court.

## II.    **LEGAL STANDARD**

The role of the court in reviewing an administrative decision denying benefits in a Social

Security matter is to uphold any factual determination made by the ALJ that is supported by

"substantial evidence."  42 U.S.C. § 405(g); Richard v. Perales, 402 U.S. 389, 401 (1971); Doak

v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986); Newhouse v. Heckler, 753 F.2d 283, 285 (3d Cir.

1985).  A reviewing court may not undertake a de novo review of the Commissioner's decision

in order to reweigh the evidence.  Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir.

1986).  The court's scope of review is "limited to determining whether the Commissioner

applied the correct legal standards and whether the record, as a whole, contains substantial

evidence to support the Commissioner's finding of fact."  Schwartz v. Halter, 134 F. Supp. 2d

640, 647 (E.D. Pa. 2001).

Substantial evidence is a deferential standard of review.  See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (quoting Pierce v. Underwood, 487 U.S. 552, 564-65 (1988)); Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987).  It is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence."  Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005).  The court's review is plenary as to the ALJ's application of legal standards.  Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).

The Social Security Act requires that the Commissioner conduct a periodic review of a child's continued eligibility for SSI.  20 C.F.R. § 416.994a.  There is no presumption of continuing disability.  See Dowling o/b/o D.Y. v. Berryhill, No. 17-2079, 2018 WL 5342786, at *11 (D.N.J. Oct. 29, 2018).  The periodic review is governed by the three-step medical improvement review standard.  20 C.F.R. § 416.994(a).  At step one of the analysis, the ALJ will consider whether medical improvement has occurred since the time of the most recent favorable decision, known as the comparison point decision ("CPD").  Id. § 416.994a(b)(1).  "Medical improvement is any decrease in the medical severity of [the claimant's] impairment(s)."  Id. § 416.994a(c).  If there has been no medical improvement, the child's disability continues; if medical improvement has occurred, the ALJ proceeds to step two.  Id. § 416.994a(b)(2).  At step two of the analysis, the ALJ must determine whether the child's impairments as established at the time of the CPD now meet or functionally equal the same listing that they met or functionally equaled at the time of the CPD.  Id.  If the child's CPD impairments do not still meet or functionally equal the severity of the listed impairments, the

ALJ must proceed to step three.  Id.  At step three of the analysis, the ALJ must determine whether the child is presently disabled, considering all current impairments.  Id. § 416.994a(b)(3).

Social Security regulations set forth a three-step sequential evaluation process that the Commissioner must follow to determine childhood disability.  Id. § 416.924.  When applying the sequential evaluation process, "the burden of proof rests on the claimant at each [of the three] step[s]."  Bricker v. Astrue, No. 10-cv-458, 2010 WL 4984214, at *2 (W.D. Pa. Dec. 2, 2010) (quoting R.J. v. Astrue, No. 08-1416, 2009 WL 2413924, at *4 (S.D. Ind. July 24, 2009)).  To establish disability, the claimant must demonstrate: (1) that he or she has not engaged in any substantial gainful activity; (2) that he or she suffers from a "severe" impairment or combination of impairments that cause "more than minimal functional limitations;" and (3) that his or her impairment or combination of impairments meets, medically equals or functionally equals the severity of an impairment in the listings.  20 C.F.R. § 416.924.

Where an impairment meets or medically equals a listed impairment, the child will be found disabled.  Id. §§ 416.924(d)(1), 416.925.  However, if a child's impairment or combination of impairments does not meet or medically equal a listed impairment, the ALJ must assess all functional limitations caused by the child's impairment to determine whether the impairment functionally equals a listed impairment.  Id.  In making such a determination, the ALJ is required to consider six specific functional domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for himself or herself; and (6) health and physical well-being. Id. § 416.926a(b)(1)(i)-(vi).  An impairment or combination of impairments "functionally equals" a listed impairment if it results in an "extreme" limitation in one domain or "marked"

limitations in two domains of functioning.  Id. § 416.926a(e)(2).

A marked limitation exists when an impairment interferes seriously with the ability to independently initiate, sustain, or complete activities.  Id. § 416.926a(e)(2)(i).  "Marked limitation . . . means a limitation that is more than moderate but less than extreme."  Id. (internal quotation marks omitted).  An extreme limitation exists when an impairment "interferes very seriously with [the] ability to independently initiate, sustain, or complete activities."  Id. § 416.926a(e)(3)(i).  "Extreme limitation also means a limitation that is more than marked."  Id.

To prove a disability claim as an adult, a claimant must demonstrate some medically determinable basis for a physical or mental impairment that prevents him or her from engaging in any substantial gainful activity for a 12-month period.  42 U.S.C. § 1382c(a)(3)(A); accord id. § 423(d)(1).  As explained in the applicable agency regulation, each case is evaluated by the Commissioner according to a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any.  If you are doing substantial gainful activity, we will find that you are not disabled. (ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirements in § 416.909, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (iii) At the third step, we also consider the medical severity of your impairment(s).  If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.  (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education and work experience to see if you can make an adjustment to other work.  If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 416.920 (references to other regulations omitted).

### III.   <u>THE ALJ'S DECISION</u>

Pursuant to the three-step evaluation process, the ALJ found that Hamadou had not been under a "disability," as defined by the Social Security Act, since June 1, 2017.  R. at 15. Specifically, the ALJ determined that the most recent favorable decision finding that Hamadou was disabled was the determination dated March 4, 2010, and that this decision was the CPD.  <u>Id.</u> at 20. At the time of the CPD, Hamadou suffered from the following medically determinable impairments: intellectual disorder and attention deficit hyperactivity disorder ("ADHD").  <u>Id.</u>  These impairments were found to meet section 112.05, Intellectual Disorder, of 20 C.F.R. part 404, subpart P, appendix 1.  R. at 20.  The ALJ determined that medical improvement occurred as of June 1, 2017.  <u>Id.</u>  From June 1, 2017 through August 8, 2018, when Hamadou turned 18 years of age, the ALJ found that the impairments that she had at the time of the CPD did not meet or medically equal, or functionally equal, section 112.05 of the listings.  <u>Id.</u> at 21-28.  In particular, the ALJ determined that Hamadou had less than marked limitations in acquiring and using information, <u>id.</u> at 23-24, attending and completing tasks, <u>id.</u> at 24-25, interacting and relating with others, <u>id.</u> at 25-26, and caring for herself, <u>id.</u> at 27; and no limitations in moving about and manipulating objects, <u>id.</u> at 26, or health and physical well-being, <u>id.</u> at 27-28.  Because the ALJ determined that Hamadou was not markedly limited in at least two of the six relevant domains or extremely limited in at least one domain, the ALJ concluded that, from June 1, 2017 through August 8, 2018, Hamadou's impairments present at the CPD did not functionally equal the listings.  <u>Id.</u> at 28.

The ALJ next determined that, from June 1, 2017 through August 8, 2018, Hamadou had the following severe impairments: disruptive mood dysregulation disorder, intellectual disorder, affective disorder, and ADHD.  <u>Id.</u>  The ALJ found that, from June 1, 2017 through August 8, 2018, no impairment, or combination of impairments, met or medically equaled a listed impairment.  <u>Id.</u>

Furthermore, the ALJ did not find that any of Hamadou's impairments or combination of impairments functionally equaled the severity of a listed disorder. Id. at 30. Once again, the ALJ considered the six domains of functioning and determined that Hamadou had a less than marked limitation in acquiring and using information, id. at 33, attending and completing tasks, id., interacting and relating with others, id. at 33-34, and caring for herself, id. at 34; and had no limitations in moving about and manipulating objects, id., or health and physical well-being, id. Because the ALJ found that Hamadou was not markedly limited in at least two of the six relevant domains or extremely limited in at least one domain, the ALJ concluded that Hamadou did not have any impairment or combination of impairments that functionally equaled the listings from June 1, 2017 through August 8, 2018. Id. at 24-25.

The ALJ next proceeded with conducting the five-step analysis to determine whether Hamadou was disabled since August 8, 2018, the day she turned 18 years old. Id. at 35-41. The ALJ found that, since August 9, 2018, Hamadou had not engaged in substantial gainful activity. Id. at 35. Beginning August 9, 2018, Hamadou had the following severe impairments: severe disruptive mood dysregulation disorder and severe intellectual disorder. Id. The ALJ determined that none of Hamadou's impairments, nor the combination of these impairments, met or medically equaled a listed impairment. Id. at 35-37. The ALJ found that Hamadou had the residual functional capacity ("RFC") to perform:

> [A] full range of work at all exertional levels. She would be limited to unskilled work with routine[] and repetitive tasks as defined in the *Dictionary of Occupational Titles* (DOT) as specific vocational preparation (SVP) levels 1 and 2. Any changes in the workplace would need to be infrequent. The individual would be limited to having occasional interaction with the general public, co-workers and supervisors. She would require jobs where the complexity of tasks is learned and performed by repetition with few variables, where little judgment is required.

Id. at 37. Relying on the testimony of the vocational expert who appeared at the hearing, the ALJ determined that Hamadou was capable of performing the following occupations: industrial cleaner,

bus cleaner, package sealer, and photocopy machine operator.  Id. at 40.  The ALJ found, therefore,

that, as an adult, Hamadou was not disabled.  Id.  Accordingly, the ALJ determined that Hamadou's

disability ended as of June 1, 2017, and she did not become disabled again prior to attaining age 18.

Id. at 34.

## IV.   HAMADOU'S REQUEST FOR REVIEW

In her Request for Review, Hamadou argues that she should have been found disabled

and contends that the ALJ erred by: (1) failing to analyze whether prior missing records needed

to be reconstructed; (2) finding that Hamadou's condition improved without having the complete

CPD by which to measure improvement; (3) failing to address the in-school support received by

Hamadou; and (4) improperly preventing Hamadou from providing certain testimony.

## V.   DISCUSSION

### A.   The ALJ Did Not Fail to Develop a Complete Record

Hamadou contends that the ALJ violated Social Security regulations by failing to analyze

whether prior missing records needed to be reconstructed.  Pl.'s Br. (Doc. No. 15) at 11-15.  In

support of this contention, Hamadou argues that the CPD in the current file was incomplete,

requiring the ALJ to undertake an analysis to determine whether the file should be reconstructed

pursuant to 20 C.F.R. § 416.994.  Pl.'s Br. at 12.  This claim lacks merit.

In support of her claim, Hamadou relies on the regulatory procedures for evaluating

continued disability.  Id. at 11.  Hamadou points to 20 C.F.R. § 416.993, which states that, in

continuing disability review cases:

> If you are entitled to benefits because you are disabled, we will have your case
> file with the supporting medical evidence previously used to establish or continue
> your entitlement.  Generally, therefore, the medical evidence we will need for a
> continuing disability review will be that required to make a current determination
> or decision as to whether you are still disabled, as defined under the medical
> improvement review standard.

Id. § 416.993(a); Pl.'s Br. at 11.  A subsequent finding of medical improvement "must be based on changes (improvement) in the symptoms, signs, or laboratory findings associated with [the claimant's] impairment(s)."  20 C.F.R. § 416.994(b)(1)(i).  Because the medical improvement determination requires an examination of the CPD, agency regulations further provide the procedure an ALJ must follow in the event a benefit recipient's CPD file cannot be located:

> If the prior file cannot be located, we will first determine whether [the claimant] is able to now engage in substantial gainful activity based on all [the claimant's] current impairments. . . .  If [the claimant is] able to engage in substantial gainful activity, we will determine whether an attempt should be made to reconstruct those portions of the missing file that were relevant to our most recent favorable medical decision (e.g., work history, medical evidence, and the results of consultative examinations).  This determination will consider the potential availability of old records in light of their age, whether the source of the evidence is still in operation, and whether reconstruction efforts will yield a complete record of the basis for the most recent favorable medical decision.  If relevant parts of the prior record are not reconstructed either because it is determined not to attempt reconstruction or because such efforts fail, medical improvement cannot be found.

Id. § 416.994(b)(2)(iv)(E).

As Hamadou acknowledges, Pl.'s Br. at 12, the record includes a copy of the March 4, 2010 Initial Disability Determination and Transmittal ("Initial DDT"), which states that Hamadou qualified as disabled beginning on October 1, 2009, due to "Mental Retardation"[4] pursuant to Listing 112.05D, which was authorized by Helen Parshall, Ph.D.  R. at 112.  At the time the initial disability determination was made, Listing 112.05D was "[c]haracterized by significantly sub average general intellectual functioning with deficits in adaptive functioning" and could be met with "[a] valid verbal, performance, or full scale IQ of 60 through 70, and a

---

[4]    In 2013, the Social Security Administration amended the listings to substitute "intellectual disability" for "mental retardation," see 78 Fed. Reg. 46499-01 (Aug. 1, 2013), a change consistent with the updated edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-V) (5th ed. 2013).

physical or mental impairment imposing an additional significant limitation of function."  See 20

C.F.R. pt. 404, subpt. P, app. 1 § 112.05 (eff. Nov. 5, 2009 to Aug. 1, 2010).  According to

Hamadou, the Initial DDT provided no explanation for the disability award or an explanation of

the secondary impairment necessary to support a finding that Hamadou met the requirements of

Listing 112.05D then in effect.  Pl.'s Br. at 13-14.

Contrary to Hamadou's assertion, however, the record contains the evidence upon which

Hamadou's initial favorable determination was made.  In addition to the Initial DDT, the record

contains the Childhood Disability Evaluation Form, also completed by Dr. Parshall, which states

that Hamadou met Listing 112.05D and explains the medical evidence supporting that finding as

follows:

> 9 y/o female with history of behavioral disturbances and academic deficiencies
> related to ADHD and mild mental retardation.  The child repeated Kindergarten.
> She requires services of full-time TSS for supervision in her 3rd grade classroom.
> Pscyhoeducational evaluation with the WISC-IV on 3/27/09 resulted in VCI 59,
> PRI 69, PSI 73, WMI 59 and FSIQ 62.  Repeat administration of the WISC-IV at
> the 2/22/10 CE with Dr. Sall resulted in equivocal findings with the exception of
> variability on working memory subtests (VCI 69, PRI 61, PSI 68, WMI 80 and
> FSIQ 61).[] The child's mental impairments markedly limit ability to function
> independently.   She receives medication and weekly therapy in addition to
> wraparound services.  The impairment is severe and meets 112.05D listing
> criteria.

R. at 614.  Consequently, the record does, in fact, explain the signs, symptoms, and clinical

observations supporting the determination that Hamadou met Listing 112.05D.[5]  20 C.F.R.

§ 416.994(b)(1)(i).  Moreover, in addition to the Initial DDT and the Childhood Disability

Evaluation Form, the record also contains the evidence upon which the prior determination was

made.  See, e.g., R. at 123 (6/1/2017 Cessation letter describing the information used to

---

[5]    Notably, Hamadou's Brief in Support of Request for Review makes no mention of
this document.

determine Hamadou's disability), 243-305 (School Services Information dated 2/9/2009 to 1/6/2010), 583-91 (Office Treatment Records dated 11/21/2007 to 11/16/2009 from Hall-Mercer Community Mental Health Center), 592-601 (Office Treatment Records dated 2/21/2004 to 12/11/2009 from South Philadelphia Pediatrics, P.C.), 602-13 (Consultative Disability Examination performed by Suzanne G. Sall, Ph.D., dated 2/22/2010).

Accordingly, the Childhood Disability Evaluation Form precisely provides the explanation for how the agency decided Hamadou was eligible for disability in 2010 and contains "the signs, symptoms, and laboratory findings or abnormalities of physical and mental function" that Hamadou claims is missing from the record.[6] 20 C.F.R. § 416.994(b)(1)(i). Because the material relevant to Hamadou's initial disability determination was contained in the record, the ALJ was not required to undergo the procedure to determine whether it was necessary to reconstruct any missing portions of the file. See id. § 416.994(b)(2)(iv)(E).

###    B.    Substantial Evidence Supports the ALJ's Finding of Medical Improvement

Alternatively, Hamadou also maintains that, even if a comparison for medical improvement could be made, there was "no evidence of meaningful improvement." Pl.'s Br. at 16-17. Hamadou challenges the ALJ's reliance on Hamadou's most recent IQ score in the

---

[6]    Hamadou's argument that the record is missing the Disability Determination Explanation from the initial adjudication is likewise misplaced. Pl.'s Br. at 13-16. According to Hamadou, this document "would have provided the necessary explanation for [] Hamadou's original disability award." Id. at 13  As discussed supra, however, the Childhood Disability Evaluation Form completed on March 4, 2010 by Dr. Parshall provided this very explanation for Hamadou's initial finding of disability. R. at 614.  Nor does any of the authority Hamadou cites mandate that a "Disability Determination Explanation" be included as part of the record. See Pl.'s Br. at 13 (citing Social Security Program Operations Manual DI 266515.001 "DDE **can** serve as the rationale" (emphasis added)).

record, arguing that the particular score relied upon by the ALJ was insufficient to support a finding of medical improvement.  Id. at 17.

The ALJ determined that the medical evidence supported a finding that, as of June 1, 2017, there had been a decrease in medical severity of the impairments present at the time of the CPD.  R. at 20.  In making this finding, the ALJ concluded that Hamadou's "most current IQ scores [from March 2016] fell in the borderline range of intellectual functioning."  Id. at 21.  Specifically, the ALJ relied on a score from the Wechsler Abbreviated Scale of Intelligence-Second Edition (WASI-II) test administered to Hamadou on March 9, 2016, contained within Hamadou's Individualized Education Program ("IEP") dated March 23, 2018.  Id. at 529.  According to the "Cognitive Functioning: WASI-II" summary, Hamadou's "general cognitive ability [was] within the Borderline range of intellectual functioning" and her "Full-Scale IQ = 75."  Id.  Hamadou alleges, however, that the ALJ's reliance on the WASI-II IQ score was insufficient because it is an "abbreviated test," and her other concurrent testing indicated that she was performing well below grade level in reading and math skills.  Pl.'s Br. at 17; R. at 530.

As an initial matter, the ALJ discussed Hamadou's IQ score as just one of the multiple pieces of evidence that supported a finding of medical improvement.  R. at 21.  For instance, in making a finding of medical improvement, the ALJ explained:

> [T]he evidence documents medical improvement. [Hamadou's] August 2015 pediatric well visit noted ADHD and some concerns related to depression, but did not note any major behavioral concerns.  Subsequent records indicate [Hamadou] no longer has behavioral outbursts in school and does not require in-school therapeutic supportive services to maintain appropriate behavior.  Her reported hyperactivity and impulsivity in the school setting has not fully ended, but it has decreased.  A 2018 Individualized Education Program (IEP) report noted that [Hamadou] was frequently absent and was easily distracted by her cell phone, but was not disrespectful or disruptive.  She was described as "functioning at age appropriate levels in all social, emotional and behavioral areas" with "Further

assessment . . . not necessary" at that time.  Her "discipline grade" was 98.  It was noted that her class behavior was excellent, that she usually followed directions, and that she participated in the general education curriculum with program modifications and specially designed instruction for most courses along with resource support.  She participated in a small group supplemental learning support program.

While [Hamadou] indicated in her testimony she has problems relating to her parents, and she may be defiant towards them, the evidence after June 1, 2017, indicated that in school, in therapy, and in the work setting, she behaves appropriately.  This decrease in symptoms relates to [Hamadou's] ability to function and demonstrates medical improvement.

Id.

Nor does Hamadou cite to any authority prohibiting the ALJ from taking into account the WASI-II IQ score in assessing the medical record to determine whether there has been medical improvement.  Cf. Coleman v. Comm'r of Soc. Sec., No. 15-64848 (RBK), 2016 WL 4212102, at *4 (D.N.J. Aug. 9, 2016) (evaluating WASI IQ score in determining that claimant does not meet the requirements of Listing 12.05).  Although the ALJ did not expressly acknowledge that the most recent test was an abbreviated IQ test, Hamadou does not point to any evidence that would suggest the results of this examination were in some way invalid.  Indeed, these test records were analyzed by school evaluation teams, who did not question the validity of the results.  R. at 529.  Moreover, at the administrative hearing and in the hearing brief, Hamadou's counsel relied on the WAIS-II IQ score as evidence that Hamadou satisfied a listed impairment. Id. at 54, 569.

Hamadou argues, however, that "[h]ad the ALJ ordered a consultative exam for a WAIS-IV [traditional full-scale IQ test]. . . Hamadou may have scored below the borderline range. . . ." Pl.'s Br. at 17.  The Agency, however, did in fact request a consultative examination of Hamadou to be performed, but Hamadou's parents failed to schedule the examination as requested.  R. at 123 ("Although she has been asked to take a special medical examination at our

expense, she has not done so. . . . You failed to schedule and take [Hamadou] to an examination necessary to determine if she was still disabled.  Therefore, we were unable to determine if she continues to be disabled."); see also id. at 116-17, 136-37.  Accordingly, Hamadou's disability was initially found to have ceased due to failure to cooperate with the continuing disability review.  Id. at 116-17, 123, 136-37; 20 C.F.R. § 416.918.  Hamadou's speculation that she *may* have scored lower on a traditional IQ test at a consultative examination that she failed to attend, see Pl.'s Br. at 17, does not undermine the ALJ's reliance on the most recent IQ test results contained in the medical record in making a finding of medical improvement.

**C.    The ALJ's Consideration of Hamadou's School Support in Finding that Hamadou Had Less Than Marked Limitations in Acquiring and Using Information and Attending and Completing Tasks is Supported by Substantial Evidence**

Hamadou next argues that the ALJ failed to consider Hamadou's capacity to function outside of a highly structured school setting, specifically as it pertained to her findings that Hamadou had less than a marked limitation in acquiring and using information and attending and completing tasks.  Pl.'s Br. at 17-19.  This claim is without substance.

When evaluating how a child's impairments affect his or her ability to function, the ALJ is required to consider how well the child can initiate, sustain, and complete his or her activities, including the amount of help or adaptations he or she needs, and the effects of structured or supportive settings.  20 C.F.R. § 416.924a(b)(5).  Section 416.924a(b)(5)(iv)(C) of the Social Security regulations provides that:

> A structured or supporting setting may minimize signs and symptoms of your impairment(s) and help to improve your functioning while you are in it, but your signs, symptoms, and functional limitations may worsen outside this type of setting.  Therefore, we will consider your need for a structured setting and the degree of limitation in functioning you have or would have outside the structured setting.  Even if you are able to function adequately in the structured or supportive setting, we must consider how you function in other settings and whether you would continue to function at an adequate level without the structured or

14

supportive setting.

Id. § 416.924a(b)(5)(iv)(C).

Here, the ALJ properly assessed Hamadou's functional capacity both inside and outside structured settings and considered the medical, non-medical, and educational evidence addressing Hamadou's behavior at school.  In her decision, the ALJ found that, from June 1, 2017 through August 8, 2018, the impairments that Hamadou had at the time of the CPD did not functionally equal the Listings of Impairments.  R. at 23.  The ALJ determined that Hamadou had a less than marked limitation in acquiring and using information and attending and completing tasks.  Id. at 23-25.  The ALJ also found that, during this same time period, Hamadou did not have any impairments or combination of impairments that functionally equaled the listings, and likewise had less than a marked limitation in acquiring and using information and attending and completing tasks.  Id. at 30-33.

In making these findings, the ALJ acknowledged that Hamadou received an IEP, in which Hamadou was provided "instructional supplementary aids and services."  Id. at 24 (citing id. at 551).  The ALJ further noted that she participated in her school's "general education curriculum with program modifications and specially designed instruction for most courses along with resource support" as well as "a small group supplemental learning support program."  Id. at 21 (citing id. at 553).  With respect to the ALJ's finding that Hamadou had less than a marked limitation in acquiring and using information, the ALJ noted her most current IQ scores fell in the borderline range of intellectual functioning.  Id. at 24.  She also discussed her IEP, which stated:

> The regular education curriculum, with instructional, supplementary aids and services, for all courses other than Math[] and English, is the least restrictive environment for [Hamadou] at this time.  She requires instructional supplementary aids and services in order to benefit from [t]his general education

15

curriculum.  However, her needs do not currently require collaborative, physical and/or social-behavioral supplementary aids and services.

Id. (citing id. at 551).  The ALJ further noted that the report stated that "based on [Hamadou's] current levels of functioning and academic performance, she is capable of attending college and being successful with the appropriate modifications to [her] program."  Id. at 24 (citing id. at 531); see also id. at 33.  Therefore, the ALJ concluded that, despite Hamadou's impairments, "she has the ability to progress in her education, when attending classes, therapy and community settings such that her limitations here are less than marked."  Id.; see also id. at 33.  Nevertheless, the ALJ acknowledged that the IEP reported that Hamadou was functioning "significantly below grade level."  Id. at 24 (citing id. at 549).

With respect to the ALJ's findings that Hamadou had less than a marked limitation in attending and completing tasks, the ALJ once again noted that Hamadou "ha[d] been functioning below grade level in school, and she require[d] learning support."  Id. at 25.  However, the ALJ also noted that Hamadou's "history of poor effort and poor attendance . . . [were] factors reasonably expected to negatively affect her school performance."  Id. (citing id. at 531); see also id. at 33.  The ALJ concluded that "[d]espite her academic challenges, she participates in the general curriculum with program modification and specially designed instruction" and "[w]hile some distractibility is noted, [Hamadou] demonstrated the ability to complete assignments of interest and task with redirection."  Id. at 25; see also id. at 33.  For example, the ALJ highlighted that, "[w]hen she was given an assignment to complete a career exploration activity, she was able to manage her time in school in order to research her topic and complete the activity satisfactorily."  Id. at 25 (citing id. at 532).  Moreover, the ALJ found that Hamadou's class behavior was not a problem and that she "usually follow[ed] directions, but she was [also] easily distracted by her cell phone."  Id. (citing id. at 531, 533).

16

Although the ALJ acknowledged that Hamadou was performing significantly below grade level in school and that she required learning support, she determined that "her grades were likely impacted by her documented history of poor effort and poor attendance." Id. at 25, 32.  Indeed, the ALJ noted that although she had been failing multiple classes, Hamadou testified that her grades had improved.  Id. at 29.  Hamadou also informed her treating psychiatrist that she had completed summer school, earned her credits, and was expected to graduate.  Id. (citing id. at 1033).  As the ALJ noted, Hamadou testified that at school, she had seven class periods during the day with different teachers, and that "school [wa]s good." Id. at 31.  Indeed, the ALJ noted that, according to a June 2018 report from Hall-Mercer Community Mental Health Center, Hamadou was reported to have been able to commit to and sustain school attendance successfully.  Id. at 32 (citing id. at 1041).  Moreover, the ALJ indicated that Hamadou was able to manage her medical appointments and had recently started working at a part-time retail position.  Id. at 31.

Therefore, the ALJ's discussion of the evidence demonstrates that, in making a finding that Hamadou had less than marked limitations in certain domains of functional equivalence, she appropriately considered the extent to which Hamadou's functioning was related to the supportive services she received in school and the sustainability of that functioning outside of the structured setting.  To the extent that the ALJ did not make explicit findings regarding Hamadou's ability to function outside of her structured school environment, the regulations requiring the ALJ to consider structured or supportive settings in evaluating functional equivalence "do[] not command the ALJ to explicitly discuss his [or her] consideration of these factors in the decision.'"  Miller v. Colvin, 193 F. Supp. 3d 467, 479 (E.D. Pa. 2016) (quoting Turner v. Barnhart, No. 05-3509, 2006 WL 2460876, at *3 (E.D. Pa. Aug. 21, 2006)); see also

Berry ex rel. M.E. v. Astrue, No. 09-4390, 2011 WL 381911, at *2 (E.D. Pa. Feb. 2, 2011).  The

Third Circuit has held that an ALJ need only "ensure that there is sufficient development of the

record and explanation of findings to permit meaningful review."  Jones, 364 F.3d at 505.  The

ALJ "need not employ particular magic words[,] . . . particular language[,] or adhere to a

particular format in conducting [his or her] analysis."  Diaz v. Comm'r of Soc. Sec., 577 F.3d

500, 504 (3d Cir. 2009) (internal quotation marks omitted).  "[T]here is a distinction between

what an adjudicator must consider and what the adjudicator must explain in the disability

determination or decision."  SSR 06-3P, 2006 WL 2329939, at *6 (Aug. 9, 2006); see also

Phillips v. Barnhart, 91 F. App'x 775, 780 (3d Cir. 2004) ("the ALJ's mere failure to cite specific

evidence does not establish that the ALJ failed to consider it").  Here, the ALJ's analysis of the

record demonstrates that she considered the relevant evidence and her findings that Hamadou did

not functionally meet the listings is supported by substantial evidence.

> **D.**  **Substantial Evidence Supports the ALJ's Finding that Hamadou Had Less Than Marked Limitations in Interacting With and Relating to Others and Caring for Herself**

Hamadou contends that the ALJ erred in finding that she had less than marked limitations

in the domains of interacting with and relating to others and caring for herself because the ALJ

improperly prevented testimony about Hamadou's struggles with her parents.  Pl.'s Br. at 19-23.

This claim is baseless.

### 1.    Interacting With and Relating to Others

With respect to interacting with and relating to others, this domain considers "how well

[the claimant] initiate[s] and sustain[s] emotional connections with others, develop[s] and use[s]

the language of [his or her] community, cooperate[s] with others, compl[ies] with rules,

respond[s] to criticism, and respect[s] and take[s] care of the possessions of others."  20 C.F.R.

§ 416.926a(i).  When considering a child's ability to interact and relate with others, the

regulations explain that adolescents (age 12 to attainment of age 18) without an impairment

should be able to initiate and develop friendships with children who are at their age and to relate

appropriately to other children and adults, both individually and in groups; begin to be able to

solve conflicts between themselves and peers or family members or adults outside their family;

recognize that there are different social rules for them and their friends and for acquaintances or

adults; and be able to intelligibly express their feelings, ask for assistance in getting their needs

met, seek information, describe events, and tell stories, in all kinds of environments and with all

types of people.  Id. § 416.926a(i)(2)(v).  Examples of limitations that the ALJ may consider in

this domain include having no close friends, or having friends who are all older or younger;

avoiding or withdrawing from people the claimant knows, or being overly anxious or fearful of

meeting new people or trying new experiences; having difficulty playing games or sports with

rules; having difficulty communicating with others; and having difficulty speaking intelligibly or

with adequate fluency.  Id. § 416.926a(i)(3).  Notably, any of the examples identified in the

regulation "do not necessarily describe a 'marked' or 'extreme' limitation."  Id.

Here, the ALJ found that, from June 1, 2017 through August 8, 2018, Hamadou had less

than a marked limitation in this domain.  R. at 33-34.  The ALJ reasoned that the 2018 IEP report

noted that Hamadou was frequently absent and was easily distracted by her cell phone, but was

not disrespectful or disruptive.  Id. at 34.  The ALJ noted that she was described in the report as

"functioning at age appropriate levels in all social, emotional and behavioral areas" with

"[f]urther assessment . . . not necessary" at that time.  Id.  (citing id. at 531).  Her "discipline

grade" was listed at 98.  Id.  Moreover, the ALJ noted that the record demonstrated "some

relational difficulties with her parents but also relates some dysfunction in the family home due

to a reported untreated mental illness of [Hamadou's] mother." Id. (citing id. at 86-87, 993).

Nevertheless, despite these issues, the ALJ noted that Hamadou "presented as cooperative, calm,

thoughtful, well-informed and appropriate during examinations." Id. (citing id. at 998). Finally,

the ALJ noted that Hamadou was able to participate in romantic relationships and establish

friendships. Id. (citing id. at 73, 78-79, 993).

Hamadou argues, however, that the ALJ improperly prevented Hamadou from providing

testimony about her reactionary relationship with her mother, which she argues would

demonstrate how her behavioral health impairment limits her ability to interact with others. Pl.'s

Br. at 20. At the administrative hearing, the ALJ heard testimony from Hamadou regarding her

relationship with her family, including testimony relating to how Hamadou and her mother did

not get along and often fought. See, e.g., R. at 84-88, 91-94, 99-100. Contrary to Hamadou's

argument that the ALJ "thwart[ed]" taking testimony related to her struggles with her parents,

Pl.'s Br. at 21, the ALJ heard ample testimony from Hamadou regarding her home environment

and relationships with her family members. See R. a 84-88, 91-94, 99-100. Indeed, Hamadou

testified that she had a close relationship with her father and brother, but did not get along well

with her mother. Id. at 86-87. After hearing testimony regarding the contentious relationship

between Hamadou and her mother, the ALJ made a referral during the hearing for family

services to investigate the issue further with respect to Hamadou's home. Id. at 99-100.

However, the ALJ explained that the remainder of the hearing was going to focus on Hamadou's

ability to work, her ability to function in school, and her employment. Id. at 100. When

Hamadou's counsel subsequently asked about her fights with her mother, the ALJ advised:

"we're not going to hear that because that's actually another hearing for another venue. Those

are dependency issues. Those are environmental issues. They are not disability issues. . . . What

she fights about her mom about [sic] . . . does not specifically affect her ability to function." Id. at 101.  The ALJ then provided Hamadou's counsel with the opportunity to provide further information about Hamadou's impairments.  Id. at 102-03.  Hamadou testified that she takes public transportation every day to and from school and  work, where she does not encounter any problems interacting with people.  Id. at 103-04.

Nor did the ALJ improperly substitute her lay opinion by interjecting when Hamadou's attorney continued to ask questions regarding Hamadou's relationship with her mother in an effort to move the testimony along.  Hamadou has not pointed to any specific questions or evidence that she was not able to address that would have provided additional information on her ability to interact with others.  In fact, Hamadou had already testified repeatedly at the hearing that she did not like her mother, that they did not get along, that therapy with her mother had not been helpful, that her mother suffers from mental health related issues for which she does not seek treatment, that she has gotten into a physical altercation with her mother, that she often feels she needs to physically defend herself, and that they constantly argue to the point where she does not feel comfortable living at the house and wants to move.  Id. at 84-88, 91-94, 99-100.  The ALJ did not conclude, contrary to Hamadou's assertion, that Hamadou's discord with her parents stemmed solely from her mother's purportedly untreated mental illness.  Pl.'s Br. at 21.  Instead, the ALJ fully acknowledged that the record "demonstrate[d] some relational difficulties with her parents but also relates some dysfunction in the family home due to a reported untreated mental illness of [Hamadou's] mother."  R. at 34 (emphasis added).  Ultimately, the ALJ's decision demonstrates that the ALJ considered the relevant evidence and simply concluded that Hamadou's impairments were not marked notwithstanding the behavioral issues she had at home.  This finding by the ALJ is entirely supported by the record.

### 2.    Caring for Herself

Hamadou also alleges that the ALJ improperly discounted evidence that would have demonstrated that Hamadou had a marked limitation in the area of caring for herself.  Pl.'s Br. at 22-23.  Specifically, Hamadou cites to an instance where she was found holding a knife to her arm and expressed suicidal ideation to doctors.  Id. at 22 (citing R. at 987).  While the evidence upon which Hamadou relies clearly shows limitations in caring for herself, substantial evidence supports the ALJ's determination that Hamadou's limitations in this regard are less than marked.

With respect to caring for yourself, this domain considers "how the [the claimant] maintain[s] a healthy emotional and physical state, including how well [he or she] get[s] [his or her] physical and emotional wants and needs met in appropriate ways; how [the claimant] cope[s] with stress and changes in [his or her] environment; and whether [the claimant] take[s] care of [his or her] own health, possessions, and living area."  20 C.F.R. § 416.926a(k).  When considering a child's ability to care for his or herself, the regulations explain that adolescents (age 12 to attainment of age 18) without an impairment should feel more independent from others and should be increasingly independent in all of their day-to-day activities, as well as begin to think seriously about future plans and what they will do when they finish school.  Id. § 416.926a(k)(2)(v).  Examples of limitations that the ALJ may consider, but that do not necessarily describe a marked or extreme limitation, include engaging in self-injurious behavior or ignoring safety rules, not spontaneously pursuing enjoyable activities or interests, and disturbances in eating or sleeping patterns.  Id. § 416.926a(k)(3).

The ALJ found that, from June 1, 2017 through August 8, 2018, Hamadou had less than a marked limitation in this domain.  R. at 27, 34.  The ALJ explained that while Hamadou had an

extensive history of chronic truancy and tardiness, she was described as "functioning at age appropriate levels in all social, emotional and behavioral areas" with "[f]urther assessment . . . not necessary" at that time.  Id. at 34.  The ALJ explicitly acknowledged that there were noted episodes of hospitalization for suicidal ideation in 2017.  Id. (citing id. at 644-69).  However, the hospital summaries described Hamadou as calm and cooperative upon admission and consistently reported family conflict as her stressor.  Id. (citing id. at 980-1062).  Hamadou's treatment records referenced improvement with mood on lower dosages of Concerta, with a reported increase in her ability to pay attention.  Id. (citing id. at 724).  Moreover, the ALJ noted that Hamadou's treatment records from October 2018 indicated improved school attendance and performance with Hamadou demonstrating "future oriented thinking with thoughts toward graduation and her desire to be a personal trainer."  Id. (citing id. at 1032); see also id. at 79-80.  Indeed, other evidence in the record demonstrated that Hamadou went to the gym five days per week, id. at 76, could cook for herself, id. at 77-78, and went out into the city with a friend, id. at 78.

        In her analysis, the ALJ thoroughly evaluated Hamadou's history of suicidal ideation.  The ALJ specifically addressed Hamadou's suicidal ideation, noting that the record indicated an April 2017 episode inpatient hospital treatment for suicidal ideation that was associated with stress in the home environment.  Id. at 21.  However, the ALJ also noted that Hamadou improved and responded well to a reduced dosage of her Concerta.  Id.  Moreover, the ALJ noted that her mental status examination findings were within normal limits upon hospital admission.  Id.  The ALJ further noted that while Hamadou argues she held a knife to her arm, the medical records reveal that she did not, in fact, injure herself.  Id. at 21 (citing id. at 651).  Of consequence, the regulations expressly state that even engaging in self-injurious behavior, including suicidal

23

thoughts or actions and self-inflicted injury, "do[es] not necessarily describe a 'marked' or

'extreme' limitation." 20 C.F.R. § 416.926a(k)(3).  Here, the ALJ thoroughly reviewed the

evidence of record, including Hamadou's history of suicidal ideation, in determining that she had

a less than marked limitation in caring for herself, and substantial evidence supports that finding.

See, e.g., Hunter ex rel. E.J. v. Astrue, No. 10-3036, 2011 WL 3513059, at *5 (E.D. Pa. Aug. 10,

2011) (substantial evidence supported ALJ's finding that child had a less than marked limitation

in caring for himself, despite psychiatric hospitalization due to suicide threats).[7]

## VI.   <u>CONCLUSION</u>

For the reasons set forth above, I find that the ALJ's decision is supported by substantial

evidence.  Accordingly, Plaintiff's Request for Review is denied.[8]

Dated:  August 23, 2021

BY THE COURT:


<u>/s/ Marilyn Heffley</u>
MARILYN HEFFLEY
UNITED STATES MAGISTRATE JUDGE

---

[7]     In her brief, Hamadou also challenges the ALJ's findings that, as of August 9, 2018, she did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments; the ALJ's RFC finding; the ALJ's finding that there were jobs that existed in significant numbers in the national economy that she could perform; and, ultimately, the ALJ's finding that, as an adult, she was not disabled.  See Pl.'s Br. at 10-11 (citing R. at 35, 37, 39, 40).  She provides no bases or additional argument, however, supporting her conclusory challenge to those findings. Nor is the Court able to find any evidence in the record demonstrating that the ALJ's conclusion that Hamadou was not disabled was not supported by substantial evidence.

[8]     Plaintiff requests oral argument with respect to her Request for Review.  Pl.'s Br. at 2.  Because oral argument would be of no consequence to this Court's decision in this matter, the request is denied.